Thank you, Your Honors. We appreciate your time. Uh, we will take the case under advisement. Counsel, I'm going to give you a moment to get set up, but I'm going to go ahead and I'll let you get started once I see everybody's settled in over there. Okay. Whenever you are ready. Okay. Good morning, your honors. And let me start, if you don't mind, with a couple of things that I understand just sort of as the basic technology background. And if you want to, that's shaping my understanding. So if I am incorrect in any way in what I'm about to say, please correct me and I would ask opposing counsel. Here's what I understand. Apple has copyrighted iOS, the operating system for the iPhone. Corellium has developed, produced, and sells a product known as Corsac. Corsac uses IPSW files, which are publicly available on the internet on third-party websites that pull the files from Apple's servers. Apple does not prevent these third-party websites from distributing the IPSW file. Apple also provides open source code for iOS on its own website. Some elements of the IPSW file are encrypted and thus cannot be used by Corellium. And some elements of iOS are not included in the IPSW file, thus the entirety of iOS is not available to a user who downloads the IPSW file. So just that's what I've tried to glean. And if I'm wrong, please correct me. So let me maybe correct on a few points or at least clarify on a few points. One is about the IPSW file being available on the internet. I think there's a suggestion that anyone can just publicly download and use iOS, and that is not correct. It is available on the internet so that users, people who have iPhones like us, can upload the files and update the different versions of iOS so it can get back to factory settings and the like. But it is sort of part and parcel of what you purchase when you purchase an iPhone or other device. It comes with iOS on it and the ability to download. You can't actually use or do anything with the IPSW files until you get them onto an Apple device. The reason the Corellium Apple product works to use the iOS files is because it disables that limitation. Normally, a license agreement would pop up and you wouldn't be able to actually use anything or do anything with iOS until you've agreed to the licensing agreements. I think that's an important distinction or at least clarification on that. The other point I think is important. Council, if I can stop you. Sure. The license agreement doesn't matter. I think both sides have sort of made that clear. The question though is, is it publicly available? So if tomorrow I figured out a technology to be able to download this thing and put it in a way that it could work on a box, just call it the box, I could do that, correct? You could download it, but you wouldn't and you'd have an implied license to download it. But I think the important difference is you wouldn't then have an implied license to copy it, to reproduce it, to create derivative works. And the Corellium Apple product does. Council, the question that Judge Branch asked was, is it publicly available? And the answer is it is. It absolutely is. It is. I don't think that has any bearing on the fair use question. And then just the other point I think worth making when we're talking about the technology and particularly the Corellium Apple product, initially this case comes to the court only on fair use. The court below assumed prima facie infringement. And so the debate, I don't know if this is incorporated in your question or not, but sort of the debate between the parties as to whether the Corellium Apple product has iOS code, how much, the open source question, all of those things are not before the court. And they're disputed on this record. If you look at footnote three of their motion for summary judgment below, it acknowledges that much of that is disputed. And so the question before the court really is limited to fair use. So if I can get to it, there's a lot in this record. There's a lot of issues in the briefs. I think three things in particular are worth highlighting where we think the district court went wrong. The first is the district court resolved genuine issues of material fact against Apple when it comes to, number one, market harm. Number two, the primary purpose of the Corellium Apple product. And number three, whether it was necessary not just to copy all of iOS, but to reveal all of iOS. So that's the first one. The second point I want to make is that even if a fact finder could conclude that the primary purpose of the Corellium Apple product is, in fact, to facilitate good faith security research, something we hotly dispute. But even if a fact finder could get there, it still wouldn't be enough to tilt the first factor in favor of fair use. And that's because merely facilitating security research, in other words, merely helping someone else do something that might be fair use, is not itself transformative. It does more than that, it seems to me. In other words, this doesn't seem to me to be the cases where you're just putting it on a different medium. You know, you're taking something and putting it on a CD. This seems to me that they're adding something. Judge Branch talked about some of those. The briefing talks about other parts, the district court's order does. They're adding at least five or six elements. You even mentioned one there. They're disabling some things in order to be able to manipulate and use it in a way that you can't use it on an iPhone. Right. And so simply adding certain features isn't what makes something transformative. In that HathiTrust case, which is the sort of predecessor to Authors Guild, involved libraries, of course, it's simply adding some value or utility isn't what makes it transformative. They need to add new creativity. So you're right. The district court talks about these like five different functionalities that you can do on the Corellium Apple product. But that's not enough to make it transformative. And the way you know that- Why is that? That seems to be a really hard line to draw there. I mean, if something has changed significantly, and it seems to me that this is significant, there is some change to it. Now, whether it's hugely transformative, I don't know that I agree with that. I think I probably fall in the moderately transformative spectrum. But to say it's not transformative, to compare it as your brief does to no more than just putting iOS on another box, it just doesn't seem to me to be right. And I would agree with you. I mean, transformativeness is a spectrum, right? It's not an on or off switch. I completely agree with that. And I think the TVI's case, the Fox News case, is very informative on that point, because the court there said, okay, it's somewhat transformative, but it's commercial on the first factor. And we're going to go look at all the other factors and actually say it should have been summary judgment the other way. So I'm not going to fight you too hard on that point. But I think in sort of deciding where it fits on the spectrum, whether it's not transformative at all, whether it's somewhat or highly, it's helpful to look at cases like Authors Guild and iParadigms. I think those are the closest cases where they were creating something new. It was something revolutionary. It was aggregating millions of works together and making something that was impossible before possible to do. And in those cases, what was critically important to the court was not just that there were a few new bells and whistles, it was a really new creative effort. And there were really important safeguards that limited what could be done with the product to that primary, different, transformative purpose. And had that not been there in Authors Guild, if more than just a few snippets were available, even if they were ones that you could actually piece together and create the whole, it would have supplanted the original, and there's no way that case would have come out the same way. In fact, I think the court even said this would be a very different case, if you could see. The difference is, at least to me, is, and I'm only speaking for myself, this is not just taking books that are hard copy and putting them electronically, and then you can focus in. It is actually changing the code in some ways. It's excising certain parts. It's adding other parts to create a different functionality. I mean, it is different. Now, again, I tend to be on the moderate side. I don't think you win on the transformative side. I think it probably is a plus factor for the other side. I think if you win, it's probably some of the other ones, some of the other factors. Let me sort of transition for a moment to, it is providing all of iOS, and that's how it's marketed, right? They say this is real iOS with real bugs and real exploits. That is the point of the product, and the thing that makes it quite different than the other cases, not just on transformativeness, but also on the third factor, because there's necessarily some overlap between the two, is that there's no safeguards. They're giving their customers everything, putting iOS at their fingertips to do with whatever they want to do with it, and that makes the case so different than the ones on which they rely. It also makes the case different than the reverse engineering cases that they rely on, where the only copying is intermediate copying, and the product that's actually sold is- Is it correct that the district court did not reach the issue of contributory use? Yeah, so that was going to be my third, the third point I was going to get to. What I want to ask that question, though, since the court did find there was fair use in the first instance, does that cover contributory as well as direct infringement? It doesn't, because the fair use question when it comes to contributory infringement is a different question than on direct infringement, so on the ladder for contributory infringement, you have to look at what the customers are actually doing with the product. So the fair use determination by the court here, not reaching the secondary portion of contributory infringement, means that the court had to consider both separately. It could not stop at the first determination. Exactly, and if you look at the decision, there's no consideration of contributory infringement at all. In fact, when the court is talking, initially, it's all about a contributory, you know, rather an infringement claim in the singular. It's not till the end that it says all of the claims are dismissed. It's a completely different analysis. It's one the court didn't engage in at all, and so if nothing else, that claim definitely has to go back, and it is a different analysis, so the court couldn't have just piggybacked off of what it already held with respect to fair use when it comes to direct infringement. Let me ask you a question. You were talking about, you said Apple is providing iOS in whole. Isn't an IPSW file missing certain aspects of a full iOS? Aren't some portions of the file encrypted? I think that maybe has changed over the years, so I don't know if I have the exact right answer to that. I don't believe that's the case. I think what's clear is that what is on the Corellium Apple product and what they're providing to their customers is all of iOS. I know they say that certain functionalities aren't available, like text or calling, but that's only now. They are trying to provide those additional functionalities. They define them as future uses, and so... But why are we looking to potential future uses? Why aren't we looking at the record now, where the record, I think you're conceding that as of right now, this full version is not made available to users of Corellium's product? I want to be clear about that. The full version is made available. There are some functionalities for hardware reasons, not because the software is not there, but for hardware reasons that are not accessible. If you look at page nine of our brief, it shows a picture of the iPhone next to the Corellium Apple device. It's the same graphical user interface that we see. They can use a mouse to do the same thing we do with our finger. They can search the web. They can change the brightness of the screen. They can change the wallpaper. It's all there at their fingertips, and again, that's precisely the point. That's how they market this product. If I could just spend a minute on market harm, because I think we've talked a little bit about the first factor. We've touched on the third. I want to ask you about that, but I want to ask you maybe a little different than where you're headed. So, I listened to the Warhol case the other day. How does that play into especially your argument about the derivative market, and specifically your argument about the icon, the art background part? Because that seems to be implicated a lot by the discussion that the court had in Warhol. I'd make, I guess, three points. I've also listened to the argument, perhaps not surprisingly. The one thing is the question in that case is about the first factor, whether you even need to look to different meaning or use. Here there's no dispute. It's the same meaning, right? It's supposed to provide real iOS, and so the primary issue in that case I don't think has much bearing here, but I think you're right that the argument did touch on a couple things that could be relevant. One is I think it was clear from the court's questioning, and really from the advocate's position, too, that you can't read transformative use so broadly that it just swallows the copyright holder's right to create derivative works, and I think that's significant here. On the fourth factor as well, when we're talking about market harm and the different markets, that's another place where derivative works and derivative markets have a role to play. The other thing I think was relevant from the argument is it was very clear that regardless of what the answer was on the first factor, in order to figure out fair use, you really had to give a close look to the other factors, and the fourth factor in particular has significant weight, and when there's factual disputes on something like market harm, that's exactly the kind of thing that needs to go to the fact finder. May I ask another question? Yes. Is security use a derivative use of what everybody would understand the Apple and the iPad to be and the iOS systems on there? How is that really a derivative use in the same way that putting a smiley face on a picture would be, which is one of the examples they talked about at the oral argument, or turning prints purple as opposed to taking a direct photograph? I think security use is, I don't know if I would call it a derivative use. I think when they're talking about derivative works, it's when you're making some sort of modification to the original software, and so whether you're using iOS for security purposes, for development purposes, the way that we use it on our iPhones, it's still the copyrighted work. You don't really have to get to the derivative nature of it. I think the derivative nature comes up when you're actually modifying it in the way that it does in order to disable certain security features. The way I think derivative works are relevant, and I think it's mostly for the fourth factor, is when you talk about different markets. Here, don't take my word for it. They market the Corellium Apple product as a substitute, and they say that our biggest competition are the physical devices. On page three of their answer, they say, go ahead, you can replace your racks of physical devices, and they have pictures of developers and security researchers looking at racks of physical devices. They say, you don't have to buy that anymore. Come buy our product. Instead, it's the same with the security research device program. They acknowledge that that's a competitor, and then iOS simulators, another one that they identify in their marketing materials as a competitor. One of the really significant areas, and I think one of the more straightforward ones, is on the fourth factor, both with respect to the burden that was their burden. Campbell actually sent the case back to see if there was maybe a rap market, a derivative rap market for the song, Oh Pretty Woman, and the court said the record is silent. It was their burden, and when there's a silent record, that disentitles the movement to summary judgment. Even in Google, when Google announced what the standard was in terms of what's legal and what's factual, it identified market harm as the paradigmatic example of the exact kind of fact question that when there's a dispute, should go to the fact finder. I see my time is up. Mr. Russell? Thank you. May it please the court, Kevin Russell on behalf of Apelli Corellium Inc. Let me start with the transformative nature of this product. This product in every application is used to shed light on the functionality of Apple's operating system. Shedding light on an existing work is a core transformative purpose, particularly in the context of computer software, where reverse engineering cases, for example, make clear that it is a transformative use of a work in order to figure out how it works. That's not what happened here, counsel. This is not a reverse engineering case. This is not we're creating a better Sega or Nintendo by opening it up, looking at it, and then making our entirely new device. That is true. What the similarity is, is that we are a tool for the sort of work that's done in reverse engineering. We are a tool for understanding the functionality. Which is why it doesn't seem to be as transformative as if you had metaphorically deconstructed your own iOS 3000. Well, a couple of things about that. First, I don't think the reverse engineering cases would come out differently if after examining the functionality of Sony's BIOS, for example, somebody wrote a paper about it instead of writing a video game about it. I think it would be different if they just put a few bells and whistles on the on the product, wouldn't it? This is not a few bells and whistles. And the reason we know that is because Apple insists that Corsa cannot safely be used without extensive vetting and monitoring of its use. While it will sell an iPhone to anybody, and it makes iOS available to anyone with an internet connection. And it takes great pride in not monitoring what anybody does. To me, that isn't much of an issue. I'm not talking about that. I'm just saying, by the record, by the district court's own order, there's really only five or six or seven big changes. Now I'm not saying it's not transformative. I'm just saying that it's hard for me to say that this is like the Sega and Nintendo cases and a little bit more like the other cases which say it's transformative, but maybe mildly so or on the spectrum there. I think the factor weighs in your favor. I'm just not sure it weighs in your favor significantly. Well, I will not belabor the point. I don't want to argue you out of that. I do think that it is more transformative than you're getting credit for. And that the question doesn't turn on how many bells and whistles, how many features we add, it is what is it being used for? What is its purpose? And the purpose is to shed light, to understand the functional unprotected aspects of the software. And that's a transformative use, even if it doesn't take a lot of work in order to shed that light. And the other piece of that is, is as a consequence, nobody buys Corsic instead of buying an iPhone. Nobody buys Corsic instead of downloading what they can already get for free off of the Internet. There is no risk of market substitution here. You're talking about the consumer marketplace, right? Apple is saying that in the developer or security researcher market, they actually are going to stop buying Apple and they're going to buy Corellia. Yes, let me turn to that. Because I just want to make the point, with all this talk about they're going to add phone calls and stuff like that, they ultimately don't argue that there's any harm to the consumer market. And so they're left with this niche market of researchers. And there's two things. There's the iPhones, the racks of iPhones. And let me start with those. Those are not racks of iPhones running standard iOS. Their own witness testified that these are racks of iPhones that are jailbroken. And one of the reasons Apple felt the need to develop these other products, like iOS Simulator, Xcode, was that it was becoming increasingly infeasible to have those racks of iPhones being used because of the increasing security that made it difficult to jailbreak them. In addition, even if every researcher on the planet forewent buying a rack of iPhones to do their research and bought Corsic instead, the question under this court's case in Cambridge University Press v. Patent is whether the fair use materially impairs defendant incentive to publish the work. And I don't think that any jury could reasonably think that that incentive was impaired here. With respect to iOS Simulator and the other works, I thought the test in mid-level U when discussing market effect was whether the defendant's use, taking into account the damage that might Is that wrong or right? No, you're definitely right there. You're taking into account all the uses. And furthermore, that we look at unrestricted and widespread conduct of the sort engaged in by the defendant would result in substantially adverse impact on the potential market for the original and harm to the mark for derivative works. Is that correct or not correct? Correct. And these are not derivative works. Tell me why that's the case. Because they serve a fundamentally different purpose. It's the same reason why Corsic is transformative. Let me ask you this. Imagine you were Apple for the moment. And you know, the normal use of the iOS is what we all have it for, iPhones, iPads, that sort of thing. And you figure out, hey, there's this niche market out there for security purposes who want to do some researching on this. We'll sell to that. That would be derivative. Would it not be? I don't even know it'd be derivative. You're selling the same work. Well, you're selling it on a different product in a different format and a different, as I understand it, their security products are not the same thing I buy. It's in a different format and in a different document in a different way, right? It's transformed, yes. Is that transformed or is that derivative? It is transformed. The difference between a transformative work and a derivative work is that a derivative work serves the same purpose as the original. A transformative work serves... It's only a purpose test, right? Think of it as principally a purpose test. It is serving this, a derivative work is serving the same purpose in a different form. What do we do with this dispute about the primary purpose for your product? I don't think that there is a genuine dispute that the purpose of the product in every... Primary. There was a reason I used the term primary. I'm going to give you not only primary, but every use is to explore the unprotected functionality of the system software. The dispute here is what people then do with the knowledge that they gain through that investigation and they say sometimes it's used for bad things and sometimes it's used for good things. Our principle submission is that that doesn't matter. That the question, particularly for public benefit, is whether the product is being used to further the cause of creating new knowledge and disseminating information. What people do with that knowledge is the subject for other statutes, like the DMCA, like the laws... What do we do with this issue the Supreme Court seems to be exploring in the Warhol case about the derivative work essentially being defined as transforming it? In other words, there's some tension between those two things that's unexplored out there. And the larger transformative is, the smaller the derivative market is and vice versa, right? That's true. And I do think it's an important distinction. But the critical distinction I think is that transformative use is being put to a use other than what the original was. The use of the original of iOS is to run consumer iPhones and to run devices. It is unsuitable for conducting security research on it, which is why Apple has developed all these other products in order to compete with Corsic in this model and this market for consumer research products. Nobody... And the flip side of that... So what is the derivative use of iOS? What would be a derivative use? Your Apple, what would a derivative use of iOS be? I think if somebody took it and took off some of the features and make it simple, for example, for senior citizens to use, that would be a derivative work. Because it's still being used on a consumer device for the basic purpose of making phone calls and then running the Internet. It's not being used to figure out how it works. That's why reverse engineering is okay. If you read those cases, it's not because they result in some additional product. It is because the courts have recognized that in order to understand the unprotected functionality of software, you have to copy it and you have to modify it. And that that is something that is special about computer software. It's one of the reasons it has thin copyright protection. And why we have to allow people greater leeway in order to avoid giving... If you study it, that doesn't seem exactly right to me. If you took iOS and changed one feature, let's say the text function, and then put it on little black boxes that you sold for every other purpose, that would be changing it. That would be transforming it in some way. And you'd be making commercial product out of it. But you would agree that would be infringing, would it not? I think probably would not be a fair use because it would be a market substitute. And so we're back to this question. Yeah, but it can't... In the Sega games, I mean, that's a market substitute. They're doing that for the purpose of making a competitive gaming device. So that can't be right either. It can't be just purpose. Nobody has suggested to me a better rule. And I do think that in Authors Guild, that was the principal thing that the court was focused on. What made the Google library project a fair use was that it was being used to shed light on the work, not to provide an electronic substitute for the original work. And nobody is buying Corsac and spending all this money on it in order to get a copy of iOS, which they can already download for free. And they're using it instead to... Let's take Google. So one thing that made Google, and then the Fourth Circuit case with the plagiarism, I'm bad with names. That's why I don't do it. High paradigm. Right. So there, what the court said there is, it's the isolating feature of it that makes it okay. If it had just been, we're giving you the same exact thing in a different electronic format, that probably wouldn't be okay. So there were two aspects in both of those cases, and some of the other TBIs, for example. There is the search function. There is the digitizing of these things in order to... Which was copying them in their entirety without transforming them at all. But it was being done to provide information about it to make them searchable, and the court said that was fine. But what... But in a limited window. But in a limited window. That's the second feature, and that's what I was just about to talk about, the snippets feature. And in the context of a written work, in the context of a television program and TBIs, making the entirety or large portions of that available, the courts determined would make... It would be a substitute for the original. It would be a market substitute, a competitor. And that's simply not the case with respect to the computer code here, particularly because I... If anybody who wants to look at iOS, anybody who wants to investigate, anyone who wants to see the pretty icons and the wallpapers can download it free from Apple and fully investigate it without using Corsic. Can I talk to you about those... So the icons and the background. Because that's lurking in the background here. The fair use of those seems to be very different, in my mind, if a court were to independently apply the test. In other words, let's forget the iOS for a second. If this lawsuit were just about the icons in the background, how would you defend that lawsuit? I would say... I mean, it's a little bit difficult because the reason we're using them is we're using them in conjunction with... It's pretty hard, isn't it? Well, no. It's difficult to analyze because we are using them in conjunction with everything else. Nobody thinks that we are selling assets to these icons and wallpapers. Nobody's buying Corsic to get access to those. I agree. It would be a different case if these were gone. But they're not seeking an injunction prohibiting us from including those three wallpapers. Except they are. I mean, they kind of are. They have separate counts and separate claims based on those things. I mean, it may seem in the larger scope of this silly, but they are, and the district court did not seem to independently analyze those. And I guess my question is, doesn't that have to happen? And don't we have to make that happen? I think the district court did analyze them. There are several paragraphs that Apple points to it and takes issue with. I think the court properly understood them and several things about them. One, that they were being used for their functional aspect, that we're not misappropriating the aesthetic creativity of those things when we put them, include them, fail to exclude them from the virtualized iPhone that's being used for research purposes. Second, there is no market harm. There's no arguable market harm. To be clear, these are three wallpapers that were used in versions of iOS, I think six through nine or something like that. We're on version 16 now. Nobody is buying Corsic, or nobody's not buying an iPhone today, or any of Apple's products, because they can get access to these icons and these wallpapers through Corsic by paying a lot more. Is there evidence for that in the record? I know you say that in your brief, what you just said. It has to be, because they can't get it. Tell me where there's evidence of that. In the district court's opinion, which he describes when it was that these wallpapers and icons were copyrighted, you can look at that list and see that those are no longer the current version. No, I understand that. I understand intellectually. Where is there evidence, since it is your burden at summary judgment, to present that, that there was evidence to support what you just said, that there's no market value, other than the logic that you've just argued to us? I think the logic is all we have, and I think it's plenty. It seems, I have to say, I'm having trouble with that. Well, look, it might be a different thing if Apple could stand up here and tell you, yes, there is a market for this. Yes, here's some evidence. They're the ones selling this stuff. It's not unfair for us once we have a logical- I guess it's an affirmative defense. It is your burden at summary judgment. It's our burden to present evidence that a reasonable jury could make the conclusion from, and I think we have, based on the fact of how this is used. And the fact that it's not, these are very small pieces of the overall software. And again, Apple is not asking for an injunction just to have us remove that. If they were, we could probably do it, and we probably would. But what they are asking for is to close down the entire process. Feel free to agree to that after we're done here. We'll see. If I could, in the last little bit that I have, just make the point that, look, at the Apple, as I said before, is making that creative expression available for anybody who wants to view it on the internet. It is not about the money. They're an enormously wealthy company. They make iOS not to sell a few iPhones to researchers. They make iOS because it's necessary in order to sell hundreds of millions of devices around the world. There is no plausible argument that this affects their incentive to create. What this is about is Apple leveraging its copyright and its modestly creative code. To control who can research and how people can research the functionality of their software and to whom they can report the vulnerabilities they find, including whether they can report it to the government for use in important national security and law enforcement investigations. That is the kind of leveraging that the Supreme Court warned about in Google. And I'm not aware of any case, any copyright case from this court or any other in which the Copyright Act has been used as a tool for suppressing the creation and dissemination of knowledge. And this court should not let this case be the first. Thank you, counsel. Ms. Sherry, you have reserved three minutes. Thank you, your honors. Logic is all we have. That is the problem with this case. This isn't a case about whether conducting good faith security research counts as fair use. It's about the particular record in this case. And over and over and over again, they rest on logic, on intuition, on amici briefs, not actually on evidence. And it was their burden. That is the tail wagging the dog. If we're talking about the icons and the art stuff, even if you're right. I mean, it's true of that, but I don't even mean just to that. I think that's a common theme in this case. It's true of the third factor. It's true of the fourth factor. It's true with respect to the wallpaper and the icons, which the court didn't analyze separately. The second point I think is important here. We're talking about markets. They say this is a niche market for developers. If you look at the case law, if you look at patent, the course books were a minuscule portion of the market. It was like 0.25% of the market for the publishers. The trivia games in the Seinfeld case, the Castle Rock case, I mean, that's not a big portion of the market. Campbell sent the case back to check out a rap derivative market for Oh Pretty Woman. So the notion that you would just focus on the consumer market is absolutely inconsistent with the case law. The idea that you can't do security research on iPhones, the devices, that's completely inconsistent. The argument is it's not derivative. I mean, that's the discussion that I had with your opposing counsel. Right, and it doesn't, I mean, first, it doesn't need to be derivative, right? Competition with the original iOS, with the actual copyrighted software is absolutely squarely within what you compete on markets. The security research device program, those are customized iPhones. You know, I think you could, you know, it's customized iOS. You could look at that as a derivative work. But the fact is they compete and they claim to compete on the actual market, the original market for iOS. It doesn't matter that it's not consumers. The other issue that they raise is purpose. And I realize I didn't get around to talking about purpose. It is hotly disputed what their purpose is. And it does matter whether they're saying, whether the evidence actually supports the fact that they're facilitating what they say, which is good faith security research, or whether instead they're facilitating the sale of exploits. Isn't it, that does seem to be what counsel's talking about is the consequence of it. But the purpose, everyone seems to agree, is to shed a light on the code, right? I mean, it's a tool to be able, for me, to be able to look closer at code that I otherwise wouldn't be able to look at. I think that is absolutely something it can be used for. But I think what the purpose is, I mean, there is evidence in the record testifying. I don't see how that's disputed. Honestly, I don't see how that's... I think that's a possible use. But I don't think that's enough. So they talk about the shed the light and they point to Authors Guild. If you read that sentence in Authors Guild, it doesn't end there. It says, and protects everything from creative expression, which I think Your Honor pointed out, right? The public display matters here. They're not shielding other things from public use. IParadigms, the Fourth Circuit case, it was just digital code. It was nothing more. And so the consequence of affirming the disreport here is not only that it would disincentivize software development. This is the creative magic that Google talked about. But it would leave copyrighted software in the hands of those who seek to exploit it for profit rather than to fix it for the public good. Thank you. Thank you. Thank you both. We have the case under advisement. And we are in recess for the day until tomorrow morning.